UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEVEN ALTMAN,

                      Plaintiff,

      -against-

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION, MARY L.
SCHAPIRO, Chairman, and ELIZABETH M.
MURPHY, Secretary,

                      Defendants.

10 Civ. 09141 (RJH)

**MEMORANDUM OPINION
AND ORDER**

---

Richard J. Holwell, District Judge:

      Attorney Steven Altman sues the United States Securities and Exchange Commission ("SEC" or the "Commission"), its Chairwoman Mary L. Schapiro, and its secretary Elizabeth M. Murphy, seeking injunctive relief including that this Court (1) stay SEC administrative proceedings against him and (2) compel the SEC to vacate its decision sanctioning Altman with a lifetime ban. After an administrative hearing and cross-appeal, on November 10, 2010, the SEC found that Altman had offered to have his client obstruct justice and perjure herself before it in return for financial benefits, and banned Altman from practice before the SEC for life. Altman's initial application to this Court for a preliminary injunction and temporary restraining order was denied at oral argument on December 8, 2010, at which time the parties agreed to treat the filings then to date as cross-motions for summary judgment. The Court now dismisses this case because it lacks jurisdiction to hear the action under Section 25 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78y.

1

## BACKGROUND

The following background material is taken from the parties' papers and exhibits. The facts are undisputed unless otherwise noted.

In 2003, the SEC was investigating a company called Harrison Securities, Inc. ("Harrison"). (Compl. Ex. A (SEC's Nov. 10, 2010 Decision and Order (hereinafter "Nov. 10 Decision")) at 3.) Harrison shared office space with another company called Nextgen Inc. ("Nextgen"). (*Id*.) Harrison's chief executive officer, Frederick C. Blummer, and Nextgen's owner, Jay Adoni, were close business associates. (*Id*.) Eventually, the SEC instituted administrative proceedings that year against Harrison and Blummer alleging violations of the Exchange Act relating to records-keeping. (*Id*. at 4.) Harrison and Blummer sought excuse from any wrongdoing by arguing that they could not maintain their records properly because their systems and files were corrupted by a computer virus. (*Id*.) During the proceedings, Harrison and Blummer were represented by a lawyer named Irving Einhorn. (*See id*. at 5.)

Also in 2003, one Bonnie Rosen was employed by Nextgen as an administrative assistant, at a $60,000 salary. (*Id*. at 3.) Though employed by Nextgen, Rosen spent half her time working for Blummer and had co-signed two car leases for him. (*Id*.) Adoni, however, fired Rosen in October 2003. (*Id*.) Having trouble obtaining severance pay, she contacted Altman, a high school friend and New York licensed lawyer, who agreed to represent her *gratis*. (*Id*. at 3-4 & n.8.) Altman contacted Adoni regarding Rosen's severance and the Blummer car leases, but Adoni refused all requests to pay the severance or to help in removiong Rosen's name from the leases. (*Id*. at 3-4.) Then in

January 2004 Rosen called the National Association of Securities Dealers ("NASD")[1] with information damaging to Harrison and Blummer's computer virus defense.[2] The NASD alerted the SEC, and the SEC attempted to contact Rosen to obtain her testimony. (*Id*. at 4.)  Rosen refused the SEC's requests and referred them to Altman, whom she identified as her lawyer. (*Id*.)  Altman would not commit Rosen to cooperate—Rosen, apparently, was hesitant because she feared that if Blummer were penalized or convicted, then she would be stuck paying off his car leases. (*Id*. at 4-5.)

Instead of cooperating with the SEC, Altman called Einhorn at least six times between January 28, 2004, and February 10, 2004. (*Id*. at 5.)  Einhorn tape recorded five of the conversations. (*Id*.)  During these talks, Altman allegedly represented that if Harrison and Blummer would pay Rosen's severence from Nextgen and would release Rosen from Blummer's car leases, then in return Rosen would agree to evade the SEC and, if subpoenaed, testify that she could not remember anything regarding their alleged computer virus. (*Id*. at 5-15.)  For example, Altman and Einhorn had the following exchange:

> ALTMAN:  [Rosen] will testify that there was no virus in the computer, and I suspect once they start peeling it away, some other very, very unhelpful stuff with respect to the books and records of the firm . . . .
>
> . . .
>
> EINHORN:  Well, suppose she gets a subpoena to appear at the hearing?
>
> ALTMAN:  . . . I, of course, can't advise her to evade the process but . . . [m]emory fades and the like. . . .

---

[1] Since 2007, the NASD has been replaced by the Financial Industry Regulatory Authority, Inc. ("FINRA").

[2] The record does not make clear whether Rosen made this call on her own initiative or on the advice of Altman.

>EINHORN:  So, what you are saying is if they reach some agreement, she would be more favorably inclined?
>
>ALTMAN:  That would be my guess as to what her recollection would be.

(*Id*. at 6-8 (transcribing the first taped call).)  And later:

>ALTMAN:  [Rosen] is going to go in [to the SEC] next week.
>
>. . .
>
>ALTMAN:  If there's not some other way to figure out some last clear chance to get out of it, because, you know, there is no—
>
>EINHORN:  What is it gonna take?  What is the bottom line?  What is it going to take?  What kind of package is this?  I am a communicator here.  What is the package that she wants to, you know, not cooperate or whatever?
>
>ALTMAN:  Get her off those leases and, you know, a year's salary, and you can even pay it out over a year.  As long as we've got—
>
>EINHORN:  What will we get if they do that, she won't cooperate or she won't remember?
>
>ALTMAN:  Probably both.

(*Id*. at 13-14 (transcribing the fifth taped call).)

Rosen never agreed to cooperate with the SEC, but the agency subpoenaed her in March 2004.  (*Id*. at 15.)  During a telephone interview with the SEC, and then again in the administrative proceedings against Harrison and Blummer, Rosen testified that the computer virus defense was a fake.  (*Id*. at 15-16.)  To impeach Rosen, Einhorn played the recordings of his phone conversations with Altman.  (*Id*. at 16.)  Einhorn then withdrew as counsel for Harrison and Blummer and turned the tapes over to law enforcement.  (*Id*. at 18.)  The administrative law judge found Rosen "thoroughly impeached" and unreliable, but nevertheless found Harrison and Blummer in violation of the federal securities laws.  (*Id*.)

In January 2008, the SEC's Office of the General Counsel ("OGC") instituted administrative proceedings against Altman alleging that Altman knowingly offered to have his client, Rosen, provide false testimony to the SEC during its investigation of Harrison and Blummer.  (Compl. Ex. B (Administrative Law Judge's Jan. 14, 2009 Decision (hereinafter "Initial Decision") at 1.)  In January 2009, an administrative law judge found that Altman had done so, and that he had thereby violated both the Disciplinary Rules of the New York State Bar Association Lawyer's Code of Professional Responsibility and the SEC's Rules of Practice.  (*Id*. at 1-2.)  Specifically, the judge ruled (1) that Altman had violated the New York Disciplinary Rules 1-102(A)(4), (5), and (7),[3] (*id*. at 26); and (2) that Altman's conduct constituted "unethical and improper professional conduct" in violation of the SEC's Rule of Practice 102 governing appearances and practice before the Commission.  (*Id*. at 27 (citing 17 C.F.R. § 201.102(e)(1)(ii)).)  Pursuant to Rule 102(e)(1)(ii) which permits "[t]he [SEC] [to] censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the Commission after notice and opportunity for hearing in the matter[] [t]o be lacking in character or integrity or to have engaged in unethical or improper professional conduct," the judge ordered that Altman be denied the privilege of appearing before the SEC for nine months.  (*Id*. at 35 (citing 17 C.F.R. § 201.102(e)(1)(ii)).)

Altman appealed the administrative law judge's decision to the SEC, and the OGC appealed her sanction.  On November 10, 2010, the Commission issued an opinion

---

[3] Those rules prohibit a lawyer from "[e]ngag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation," "[e]ngag[ing] in conduct that is prejudicial to the administration of justice," and "[e]ngag[ing] in conduct that adversely reflects on the lawyer's fitness as a lawyer." N.Y. Code of Prof'l Responsibility DR 1-102(A)(4), (5), (7).

5

upholding the administrative law judge's decision, but increasing her sanction to a lifetime ban. (Nov. 10 Decision at 1.) Altman then instituted the present proceeding on December 7, 2010, arguing that the SEC's proceedings against him wrongfully usurped powers properly held by the New York State court system, and that those proceedings amounted to violations of his constitutional rights to due process, equal protection, and privacy. (Compl. ¶¶ 27-37.) Altman seeks, *inter alia*, to vacate the SEC's decision and stay all SEC proceedings against him.

## DISCUSSION

**The Court's Jurisdiction to Hear This Action**

The SEC argues that the Court need not "consider the substance of Altman's arguments because this Court does not have jurisdiction over his claims." (Defs.' Opp'n at 4.) The SEC relies on Section 25 of the Exchange Act, 15 U.S.C. § 78y, which provides, in relevant part:

> A person aggrieved by a final order of the Commission entered pursuant to this chapter may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has his principal place of business, or for the District of Columbia Circuit, by filing in such court, within sixty days after the entry of the order, a written petition requesting that the order be modified or set aside in whole or in part.

15 U.S.C. § 78y(a)(1).

The SEC contends that Section 78y(a)(1) requires that Altman bring any action challenging his sanction, based on constitutional arguments or otherwise, in the Court of Appeals. They are correct. "The Court of Appeals for the Second Circuit has held that generally under the Exchange Act 'a litigant is required to pursue all of his administrative remedies before he will be permitted to seek judicial relief.'" *American Benefits Grp.,*

6

*Inc. v. Nat'l Ass'n of Securities Dealers*, No. 99 Civ. 4733, 1999 WL 605246, at *5 (S.D.N.Y. Aug. 10, 1999) (quoting *Touche Ross & Co. v. Securities and Exchange Commission*, 609 F.2d 570, 574 (2d Cir. 1979)). The Exchange Act allows those aggrieved by SEC orders or rules to bring challenges in a United States Court of Appeals. 15 U.S.C. § 78y(a)(1), (b)(1). Those courts' jurisdiction is exclusive. 15 U.S.C. § 78y(a)(3), (b)(3). Thus district courts lack jurisdiction to hear post-enforcement challenges seeking declaratory and injunctive relief related to disciplinary proceedings—such challenges must proceed in accordance with the statutory scheme. *Barbara v. New York Stock Exchange, Inc.*, 99 F.3d 49, 57 (2d Cir. 1996). The same is true regarding on-going or pre-enforcement disciplinary proceedings, *i.e.*, proceedings before any final decision has issued. *Hayden v. New York Stock Exchange, Inc.*, 4 F. Supp. 2d 335, 339 (S.D.N.Y. 1998).[4] And the fact that a plaintiff raises a constitutional challenge to SEC rules does not alter the analysis or application of Section 78y. *American Benefits Grp.*, 1999 WL 605246, at *5 (declining to exercise jurisdiction over facial challenge to constitutionality of SEC reporting rules and dismissing case) (Koeltl, J.).

Altman attempts to avoid the Exchange Act's procedural requirements by pointing to the Supreme Court's recent decision in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3138 (2010). In *Free Enterprise* the Court held, *inter alia*, that a constitutional challenge to the existence of the Public Company Accounting Oversight Board ("PCAOB"), created by Congress under the 2002

---

[4] The *Hayden* court found "especially significant Congress's failure to assign any role to the district courts in this detailed and comprehensive scheme created for the discipline of exchange members and associated persons. Indeed, the exercise of jurisdiction by a district court in this case would seriously undermine Congress's manifest intent that issues not raised before the SEC should not be subject to judicial review. It follows that since Congress has exercised such care in crafting this procedural structure, Congress's failure to assign any role to the district courts strongly suggests that Congress intended the statutory review procedure to be exclusive." 4 F. Supp. 2d at 339.

Sarbanes-Oxley Act, need not be brought before the SEC and then appealed to the Court of Appeals pursuant to Section 78y. *Free Enterprise*, 130 S. Ct. at 3150-51. Altman's reliance on Free Enterprise, however, is flawed and unavailing for several reasons, addressed below in turn.

Though "[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies, [t]his rule is not mandatory." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) (internal quotation marks and citations omitted). To that end, district court review of a constitutional attack is restricted when the relevant "statutory scheme displays a fairly discernible intent to limit jurisdiction, and the claims at issue are of the type Congress intended to be reviewed within th[e] statutory structure." *Free Enterprise*, 130 S. Ct. at 3150 (internal quotation marks omitted) (alteration in original). When, as here, a jurisdictional scheme is explicitly laid out in the statute, preclusion of district court review turns on whether "'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Id.* (quoting *Thunder Basin*, 510 U.S. at 212-13). Of the three factors, the first seems most important; and indeed that a plaintiff's "constitutional claims [] can be meaningfully addressed in the Court of Appeals," *Thunder Basin*, 510 U.S. at 215, trumps other considerations such as that administrative review is conducted internally rather than independently and that the reviewing body lacks expertise in reviewing constitutional questions. *See id.*[5]

---

[5] Specifically, the *Thunder Basin* Court explained that the rule removing constitutional challenges from adjudication pursuant to the procedural rules of the administrative agency challenged "is perhaps of less consequence where, as here, the reviewing body is not the [Department of Labor] itself but an independent commission established exclusively to adjudicate Mine Act disputes. The [Federal Mine Safety and Health

In *Thunder Basin* the Supreme Court found that the Federal Mine Safety and Health Amendments Act's language that "[a]ny person adversely affected or aggrieved by an order of the Commission issued under this chapter may obtain a review of such order in any United States Court of Appeals for the circuit in which the violation is alleged to have occurred" requires that due process-based facial constitutional challenges to that act's requirements be brought first before the Federal Mine Safety and Health Review Commission, and afterwards only in the relevant Court of Appeals. *Thunder Basin*, 510 U.S. at 205, 207 ("[W]e conclude that the Mine Act precludes district court jurisdiction over the pre-enforcement challenge made here."). Likewise a facial First Amendment challenge to certain provisions of the Social Security Act must follow the equivalent statutory scheme, in which a district court lacks jurisdiction, because the Social Security Administration has does not lack expertise in interpreting the constitutionality of its rules and because any constitutional claims could be meaningfully addressed in the Court of Appeals. *Nat'l Taxpayers Union v. United States Social Security Admin.*, 376 F.3d 239, 243-44 (4th Cir. 2004). In coming to the same conclusion when faced with a constitutional challenge to administrative orders of the Occupational Safety and Health Act ("OSHA"), the First Circuit stated, "invocation of constitutional authority, without more . . . [can]not allow plaintiffs to circumvent the stautory review process with an agile game of word play." *Eastern Bridge, LLC v. Chao*, 320 F.3d 84, 91 (1st Cir. 2003) (affirming district court's dismissal of facial Fourth Amendment privacy right constitutional challenge to OSHA surveys). The D.C. Circuit, when faced with a similar Fourth Amendment challenge to OSHA orders, came to the same result. *Sturm,*

---

Review] Commission has addressed constitutional questions in previous enforcement proceedings. *Even if this were not the case, however*, petitioner's statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals." 510 U.S. at 215 (internal citations omitted) (emphasis added).

*Ruger & Co. v. Chao*, 300 F.3d 867, 873-75 (D.C. Cir. 2002) (affirming district court's dismissal of pre-enforcement facial constitutional challenge to OSHA provision because plaintiff could obtain review in Court of Appeals). Likewise, the Third Circuit reached the same conclusion on a post-enforcement constitutional due process challenge to certain provisions of the Immigration and Nationality Act, which provides for the same jurisdictional procedure. *Massieu v. Reno*, 91 F.3d 416, 421-22, 424 (3d Cir. 1996) (reversing district court's exercise of jurisdiction because, *inter alia*, that act provides that judicial review of adverse decisions be sought in the Court of Appeals).

Altman provides no argument why this court should deviate from these authorities, and the Court declines to do so. The Exchange Act's enforcement and review procedures, at issue in this action, are procedurally analogous to the statutes discussed above and similarly require that Altman's challenge be brought in the Court of Appeals (or in the first instance administratively). Altman does not dispute, nor can he, that the SEC has the authority and expertise to hear constitutional challenges to its rules or rule-making provisions. (*See* Pl.'s Reply at 5)[6]; *Free Enterprise* 130 S. Ct. at 3150; *Touche Ross*, 609 F.2d at 577 ("the [SEC] has the power to declare its own rule invalid."). Moreover, as the Exchange Act explicitly provides for it, Altman's claim could be meaningfully addressed in the Court of Appeals. *See Hayden*, 4 F. Supp. 2d at 339. Finally, as Altman's challenge is not "to the [SEC's] existence," but is instead to the constitutional ability of the SEC to sanction attorneys practicing before it, *i.e.* the SEC's "auditing standards, registration requirements, *or other rules*," the claim is not "wholly collateral" to the Exchange Act's review provisions. *Free Enterprise*, 130 S. Ct. at 3150

---

[6] Altman's argument is merely that the SEC's ability to hear the challenge at issue is "not controlling." (Pl.'s Reply at 5.)

(finding petitioner's constitutional challenge "collateral" because "petitioners object to the [PCAOB's] existence, not to any of its auditing standards.").

This final point highlights the fundamental flaw with Altman's reliance on *Free Enterprise*. In that case the government argued that petitioner was required, under Section 78y, to bring his facial constitutional challenge to the existence of the PCAOB in the first instance before the SEC. *Id*. The PCAOB, however, was not the creation of an SEC rule or provision; instead it was a separate "Government-created, Government-appointed entity . . . [placed by Sarbanes-Oxley] under the SEC's oversight." *Id*. at 3147-48. And the challenge did not ask the district court to review "a final Commission order or rule," the realm of Section 78y; it asked the court the court to review the constitutionality of Congressional action. *Id*. at 3150. The petitioner was not challenging the PCAOB's or the SEC's constitutional authority to, for example, issue sanctions, but was instead "seeking . . . a declaratory judgment that the [PCAOB] [was] unconstitutional." *Id*. at 3149. In other words, "petitioners object[ed] to the [PCAOB's] existence" in the first place. *Id*. at 3150. The Court held that the district court properly exercised jurisdiction not because the challenge was constitutional, but because the nature of the challenge was such that compliance with Section 78y would force the petitioner to arbitrarily select a PCAOB rule "at random" before any meaningful avenue for review of the underlying constitutional claim could commence. *Id* at 3150-51 (finding, as well, that requiring a plaintiff to "bet the farm" by "taking violative action" would not be a "meaningful avenue of relief," when the question is not the constitutionality of any administrative provision or rule but is instead the constitutionality of the agency itself.)

Altman's action is entirely different. Altman challenges the extent of the SEC's ability to sanction attorneys under the SEC's own rules. Instead of having to randomly select a rule in order to institute an administrative or judicial proceeding otherwise unavailable, Altman can, and does, challenge a rule that directly affects him. Forcing Altman to invoke the SEC's disciplinary provisions is far from arbitrary—indeed those provisions go to the heart of Altman's case. Altman challenges the SEC's constitutional authority to continue administrative proceedings against him, and to issue the sanction resulting from those proceedings—he asks for the "judicial review of *Commission* action," which the Free Enterprise Court indicated would fall directly under Section 78y. *Free Enterprise*, 130 S. Ct. at 3150 (emphasis in original). Finally, and most importantly, any constitutional challenge raised in his administrative proceedings will be meaningfully addressed in the Court of Appeals should Altman appeal the SEC's sanction against him. Thus Altman's reliance on *Free Enterprise* does not insulate him from the Exchange Act's procedural requirements.

Altman's secondary reliance on the Second Circuit's 1979 decision in *Touche Ross* is equally misplaced. In that case, the court found district court jurisdiction proper over plaintiff's claim that the Exchange Act did not grant the SEC the authority to enact rules providing for the disciplining of attorneys who practice before it. *Touche Ross*, 609 F.2d at 577.[7] The court reasoned that administrative review of the question in the first

---

[7] The Court went on to hold that SEC disciplinary rules "represent[] a valid exercise of the Commission's rulemaking power." *Touche Ross*, 609 F.2d at 582. The precise issue in that case is now moot, however, as Congress explicitly gave the SEC that authority by enacting Sarbanes-Oxley. *See* 15 U.S.C. § 78d-3(a) ("The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found by the Commission, after notice and opportunity for hearing in the matter (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.").

instance would be inappropriate because of the plaintiff's hardship in submitting to the disciplinary provisions it was challenging, and because the SEC had no need to develop its own factual or legal record in the dispute. *Id*. at 576-77. Courts have read *Touche Ross* narrowly, however, and found its application especially inappropriate when a litigant invokes it to avoid agency review procedures, or when the agency in question is not "acting 'plainly beyond its jurisdiction.'" *See ITT Continental Banking Co. v. United States*, 559 F. Supp. 454, 455-56 (S.D.N.Y. 1983) (quoting *Touche Ross*, 609 F.2d at 576). Here any harm to Altman due to the requirement that he raise his constitutional challenges before the SEC seems minimal as he has already litigated at least two hearings on the issue—one before an administrative law judge and one before the SEC itself. Moreover, based on Congress's enactment of Sarbanes-Oxley, which explicitly gave the SEC the power to discipline attorneys for, *inter alia*, "engag[ing] in unethical or improper professional conduct," 15 U.S.C. § 78d-3(a)(2), Altman cannot argue that the SEC's sanction of him was an action plainly beyond its jurisdiction.

  The Court has considered Altman's remaining arguments and finds them either inapposite or without merit.[8] The Court lacks jurisdiction to hear this action and accordingly dismisses this case.

---

[8] For example, Altman argues that his claim is ripe, (Pl.'s Reply at 5); that he is likely to succeed on the merits (*id*. at 6); that the SEC is biased in that it has continued to prosecute its disciplinary proceedings against him (*id*.); and that the SEC has no interest in internally deciding the constitutional questions he raises (*id*. at 7). Though of those four arguments the latter three are highly in doubt, all are irrelevant to the Court's analysis of the jurisdictional issue.

## CONCLUSION

For the reasons stated above, the SEC's cross-motion for summary judgment is GRANTED and this case is dismissed; and Altman's cross-motion for summary judgment is DENIED. The Clerk of the Court is directed to close all outstanding motions in this case, [4, 5], and close this case.

SO ORDERED.

Dated: New York, New York
March 6, 2011

Richard J. Holwell
United States District Judge